RECEIVED
USDC, WESTERN DISTRICT OF LA
TONY R. MOORE, CLERK
ALEXANDRIA, LOUISIANA
DATE 8-17-11
BY _____

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA DIVISION

| | |
|---|---|
| WOODY D. BILYEU, et al. | CIVIL ACTION NO. 1:08-cv-2006 |
| -vs- | JUDGE DRELL |
| JOHANSON BERENSON LLP, et al. | MAGISTRATE JUDGE KIRK |

## MEMORANDUM RULING AND ORDER

Before the Court is Defendants' motion to stay the present proceedings pending arbitration. (Doc. 95). For the reasons given below, this motion is DENIED.

### BACKGROUND

In January and February 2004, the law firm of David R. Johanson and Rachel J. Markun, a Professional Corporation (formerly David R. Johanson, A Professional Corporation) ("the Law Firm") signed identical "Attorney-Client Fee Agreement[s]" ("the Agreements") with two companies, Comm-Craft, Inc. and DirecTech (collectively "the Companies"). Under those Agreements, the Law Firm agreed to:

> provide the following legal services to and on behalf of [the Companies] ("the Services"): Consult with and provide advice regarding the analysis, feasibility, design, and, potentially, implementation of (a) [the Companies'] Employee Stock Ownership Plan and Trust and (b) a liquidity plan for [the Companies] and [their] shareholders and related transactions. The Attorney also will provide such other and further services to [the Companies] as may later be agreed upon between the Attorney and [the Companies] which Services will be subject to this Agreement.

(Doc. 95-3, pp. 5 and 10, ¶ 1, "Services to be Performed"). These agreements also contained a broad arbitration clause requiring arbitration, under the Federal Arbitration Act (FAA), of "any and all disputes arising pursuant to any of the terms of this Agreement or which relate in any manner

whatsoever to the Services provided by the Attorney to or on behalf of [the Companies.]" (Doc. 95-1, pp. 7, 12).  Woody Bilyeu, Plaintiff here and a former stockholder and officer of both companies, signed both Agreements in his corporate capacity.

The Law Firm performed this work, establishing Employee Stock Ownership Plans (ESOPs) for both of the Companies and executing the liquidity plan – permitting the shareholders to sell their shares to those Plans – by the end of the summer of that year.  (Doc. 98, p. 7).  Near the end or shortly after this work was completed,[1] Mr. Johanson began to advise Plaintiffs Mary H. Bilyeu and Woody D. Bilyeu (collectively "Plaintiffs") as to the so-called "Loan Strategy."  This strategy was designed to permit Plaintiffs to avoid substantial tax liabilities for the proceeds they realized from selling their shares by reinvesting those proceeds in new investment property and loaning that property to an off-shore corporation in exchange for cash.  No new written contract between the Bilyeus and any of the Defendants here was executed.

The scheme failed.  The IRS disallowed the deduction, and more importantly, according to Plaintiffs' allegations, Mr. Johanson, with the help of the off-shore corporation, defrauded Plaintiffs; allegedly, instead of holding onto the shares as collateral, the corporation sold them and split the ill-gotten earnings with Mr. Johanson.  (Doc. 1-2, pp. 4-5, 11-14).  Mr. Johanson, personally and as representative of the other Defendants here, denies these allegations.

In this action, the Bilyeus sued Mr. Johanson personally, the Law Firm with whom the Companies had contracted and in which Mr. Johanson is a partner, and Johanson Berenson LLP,

---

[1] The parties disagree as to this timing.  Plaintiffs claim that the work for them as individuals began "[o]nly after [the Law Firm] had completely implemented the ESOP transaction."  (Doc. 98, p. 7).  The Johanson Defendants claim the work began as early as February 2004.  (Doc. 99, p. 3).  This disagreement is ultimately irrelevant to our decision, and we decline to resolve it here.

apparently also a partner in the Law Firm.  (Collectively "the Johanson Defendants").  Separately, Plaintiffs have also filed suit against the off-shore corporation, its owners, and various other investment advisors and financial firms allegedly involved in the scheme.

The Johanson Defendants have filed the present motion to stay, claiming that Plaintiffs, as individuals, are bound to arbitrate under the arbitration clause in the above referenced Attorney Client Fee Agreements, though they undisputably are personally not signatories to those Agreements.

ANALYSIS

## I.  General Legal Standards

### 1.  Arbitration under the FAA

It is well settled that whether parties have agreed to submit a particular dispute to arbitration is typically an issue for judicial determination.  *Granite Rock Co. v. Int'l Broth. of Teamsters*, 130 S.Ct. 2847, 2855-56 (2010) ("[T]hese issues typically concern the scope of the arbitration clause and its enforceability.  In addition, these issues always include whether the clause was agreed to, and may include when that agreement was formed.") (citing *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 [2002]; *AT & T Technologies, Inc. v. Communications Workers*, 475 U.S. 643, 649 [1986]; *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 546-547 [1964]) (internal quotations omitted).

"When deciding whether the parties agreed to arbitrate a certain matter . . . courts generally . . . should apply ordinary state-law principles that govern the formation of contracts." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) (citing, e.g., *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 62-63, and n. 9 [1995]; *Volt Info. Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 475-476 [1989]; *Perry v. Thomas*, 482 U.S. 483, 492-493, n. 9, [1987]).

"Arbitration is 'strictly a matter of consent.'" *Granite Rock*, 130 S.Ct. at 2857 (quoting *Volt*, 489 U.S. at 479).  It "thus 'is a way to resolve those disputes – *but only those disputes* – that the parties have agreed to submit to arbitration."  *Id.* (quoting *First Options*, 514 U.S. at 943).

The FAA provides that a written arbitration agreement "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.  "Although it is often said that there is a federal policy in favor of arbitration, federal law places arbitration clauses on equal footing with other contracts, not above them."  *Janiga v. Questar Capital Corp.*, 615 F.3d 735, 740 (7th Cir. 2010) (Judge Wood) (citing *Rent–A–Center, West, Inc. v. Jackson*, 130 S.Ct. 2772, 2776 [2010]; *Volt*, 489 U.S. at 476; *Gotham Holdings, LP v. Health Grades, Inc.*, 580 F.3d 664, 666 [7th Cir.2009]).

Any preference for arbitration is reserved for the interpretation of the scope of a valid arbitration clause, not the question of whether an arbitration agreement exists between these parties, or whether such an agreement was "ever concluded."  *Granite Rock*, 130 S.Ct. at 2855; *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 444 n. 1 (2006); *First Options*, 514 U.S. at 944; *AT & T Techs., Inc.*, 475 U.S. at 649–50; *Janiga*, 615 F.3d at 740.  "Although there is a presumption favoring liberal construction of arbitration clauses, that presumption is not applicable to the threshold determination [of] whether a party has agreed to arbitrate."  *Blaustein v. Huete*, 2010 WL 7097472 at *1 (5th Cir. 2010) (internal citations omitted).  The Supreme "Court has never held that the presumption [favoring arbitrability] overrides the principle that a court may submit to arbitration 'only those disputes . . . the parties have agreed to submit,' nor that courts may use policy considerations as a substitute for party agreement."  *Granite Rock*, 130 S.Ct. at 2851 (quoting *First Options*, 514 U.S. at 943) (citing *AT & T Techs.*, 475 U.S. at 648).  "The presumption should be

applied only where it reflects, and derives its legitimacy from, a judicial conclusion . . . that arbitration . . . is what the parties intended because their express agreement to arbitrate was validly formed, [and] is legally enforceable." *Id.*

## 2. *Severability*[2]

Severability is a frequently misunderstood doctrine.  See Alan Scott Rau, *Everything You Really Need to Know About "Separability" in Seventeen Simple Propositions*, 14 Am. Rev. Int'l. Arb. 1, 2 (2004) ("the notion of 'separability,' or the 'autonomy' of the arbitration clause, is still regularly subject to considerable misunderstanding.").  The principle was enshrined in American arbitration law in the case of *Prima Paint Corp. v. Flood & Conkin Mfg. Co.*, 388 U.S. 395 (1967) ("*Prima Paint*").  There, the Supreme Court sided with the Second Circuit in holding that "except where the parties otherwise intend[,] arbitration clauses as a matter of federal law are 'separable' from the contracts in which they are embedded." *Id.* at 402.  Under this doctrine, "where no claim is made that fraud was directed to the arbitration clause itself, a broad arbitration clause will be held to encompass arbitration of the claim that the contract itself was *induced* by fraud." *Id.* (emphasis added).  As refined in later cases,[3] the consequence of the doctrine is that a party challenging an arbitration clause must present a challenge that goes to the existence, validity, or enforceability of the arbitration clause itself, and not (only) to the "contract as a whole." See *Buckeye*, 546 U.S. at 444; See also *Granite Rock*, 130 S.Ct. at 2856.

The mistake arises when this doctrine is interpreted to mean that the arbitration clause *alone*

---

[2] In the early cases on this topic, discussed below, this doctrine was referred to as "separability."  In more recent decades, see, e.g., *Rent-A-Center, West, Inc. v. Jackson*, 130 S.Ct. 2772, 2779 (2010), and in other jurisdictions, this doctrine has been referred to as "severability," which usage we employ here.

[3] Including, *inter alia*, *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938 (1995), *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440 (2006), and most recently, *Granite Rock*, 130 S.Ct. 2847.

must be challenged, and its enforceability cannot be disturbed through a challenge to the "contract as a whole."[4] This is inaccurate. The correct rule of severability, as clarified in the Supreme Court's recent ruling in *Granite Rock*, is that a party can challenge the arbitration agreement by challenging the contract as a whole, if that challenge, if maintained, would also render the arbitration agreement contained therein non-existent, invalid, inapplicable, or unenforceable. So, as the Justices discussed in the oral argument to *Rent-a-Center v. Jackson*,[5] a challenge that a party only signed a contract because she had a gun to her head would render the underlying contract unenforceable, as well as any arbitration clause contained therein, even if that clause is severed and separately considered. Similarly, an allegation of incapacity, lack of authority, or that a party never signed a contract in his individual capacity, though all challenges targeting the "contract as a whole," can also render the arbitration agreement unenforceable as to those parties. See *Granite Rock*, 130 S.Ct. at 2856; *Buckeye*, 546 U.S. at 444, n. 1; *Janiga*, 615 F.3d at 741-42.

## II. Binding Nonsignatories to Arbtirate–the Doctrine of Equitable Estoppel

The Johanson Defendants admit that Plaintiffs did not sign the present Attorney Client Fee Agreements in their individual capacities. Nonetheless, they claim that Plaintiffs are bound to arbitrate under these agreements based on the doctrine of "direct-benefit estoppel." (Doc. 95-1, pp. 8-10). They argue that this doctrine "involves nonsignatories who have embraced the contract

---

[4] For a discussion of these errors, see Rau, *supra*, 14 Am.Rev.Int'l.Arb. 1, 16, fn. 46 and accompanying text (discussing, e.g., *Green Tree Financial Corp. of Ala. v. Wampler*, 749 So.2d 409 [Ala. 1999]). Given the Supreme Court's recent clarification of *Buckeye's* footnote 1 in *Granite Rock*, the federal cases which Professor Rau cites in this discussion, including possibly *Villa Garcia v. Merrill Lynch, Pierce, Fenner & Smith*, 833 F.2d 545 (5th Cir. 1987), may have been overruled.

[5] Oral argument transcript available at: http://www.supremecourt.gov/oral_arguments/argument_transcripts/09-497.pdf. The discussion on this point begins at page 10, with the relevant remarks coming at page 21.

despite their nonsignatory status" and "applies when a nonsignatory 'knowingly exploits the agreement containing the arbitration clause.'" (Doc. 95-1, p. 8) (citing and quoting *Hellenic Investment Fund, Inc. v. Det Norske Veritas*, 464 F.3d 514, 517-18 [5th Cir. 2006]).

In their filings, the Johanson Defendants base their arguments primarily on three cases, *Arthur Andersen LLP v. Carlisle*, 129 S.Ct. 1896 (2009) ("*Arthur Andersen*"), *Hellenic Investment Funds, Inc. v. Det Norske Veritas*, 464 F.3d 514 (5ᵗʰ Cir. 2006) ("*Hellenic*"), and *Blaustein v. Huete*, 2009 WL 2982928 (E.D. La. 2009) ("*Blaustein*"). We find that they misinterpret the first two cases by taking certain favorable statements of dicta out of context in a way that ultimately misstates the cases' holdings and unnecessarily brings them into contradiction with other Fifth Circuit precedent on this issue. Meanwhile, the final case, a district court decision, was in the Johanson Defendants' favor, but it has been overturned, with the Fifth Circuit holding precisely on point against them. 2010 WL 7097472 (5ᵗʰ Cir. 2010).

Regarding the first case, as the Johanson Defendants argue, in *Arthur Andersen* the Supreme Court recognized that nonsignatories can be bound to arbitrate under agreements they did not sign. (Doc. 95-1, pp. 7-8). However, the Johanson Defendants misstate the breadth of the Supreme Court's holding in that case. There, the Court reviewed a Sixth Circuit decision which held that "nonparties to a contract are categorically barred" from being compelled to arbitrate under that contract, *even where state law would otherwise permit the enforcement of that contract against them. Arthur Andersen*, 129 S.Ct. at 1902. The Sixth Circuit thus found that the FAA preempted state law permitting arbitration to forbid arbitration of these claims. In overruling this view, the Supreme Court held that "whatever the meaning" of the FAA "it cannot possibly require the disregard of state law *permitting* arbitration by or against nonparties to the written arbitration agreement." *Id.* 129

S.Ct. at 1902. In contrast to what the Johanson Defendants claim here,[6] it said nothing about whether, or in which circumstances, nonsignatories could be bound to arbitrate under agreements they did not sign as a matter of federal law.[7]

Regarding the second case, in *Hellenic*, the purchaser of a ship brought a maritime suit against a ship classification society alleging fraudulent misrepresentation in the ship's classification documents. The seller of the ship had procured the classification documents under a contract which contained an arbitration clause, but to which the purchaser of the ship was a nonsignatory. The Court found that the purchaser was nonetheless bound to arbitrate its claim against the classification

---

[6] The Johanson Defendants' confusion on this point seems to stem from the Court's statements about "'traditional principles' of state contract law," by which a nonsignatory may be bound, including "'assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary theories, waiver and estoppel.'" *Arthur Andersen*, 129 S.Ct. at 1903 (quoting 21 R.Lord, *Williston on Contracts*, § 57:19, p. 183 [4th ed. 2001]). The Court made this statement to note that traditional contract law universally permits nonsignatories to be bound in some circumstances, and there is no indication that the FAA was meant to sweep away this jurisprudence. It did not decide that such principles should be applied to the case and contract before it, as evidenced by the fact that it remanded the case to the lower court for determination of "whether the relevant state contract law recognizes equitable estoppel as a ground for enforcing contracts against third parties." *Id.*

[7] Compare also *Washington Mut. Finance Group, LLC v. Bailey*, 364 F.3d 260, 267 n. 6 (5th Cir. 2004) (applying federal law, but also finding a false conflict, as the same result would have been warranted under applicable Mississippi law) and *Fleetwood Enterprises, Inc. v. Gaskamp*, 280 F.3d 1069, 1074-75 (5th Cir. 2002) (applying Texas law to determine where a nonsignatory was bound by arbitration agreement). The *Washington Mutual* court applied federal law in part because it found that the issue "presents no state law question of contract formation or validity." *Id.* (quoting *Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH*, 206 F.3d 411, 417 n. 4 [4th Cir. 2000]). Respectfully, the Supreme Court may have overruled this analysis in *Granite Rock*, where it overturned a Ninth Circuit panel that similarly only analyzed an agreement's formation and validity and did not also consider issues of "enforceability." 130 S.Ct. at 2856. A common example of a doctrine in this category is third party beneficiary, which concerns neither contract formation nor validity, but instead determines, as a recognized part of state contract law, against whom a given contract may be enforced. We need not confront this choice of law question here – whether state or federal law applies, and if state law, that of which state – because the parties did not place it at issue, and because it presents a false conflict, as we find, given the facts before us, that the doctrine of equitable estoppel exists in a form similar to that presented by the parties under the contract law of both Louisiana and California, the states whose contract law would most likely apply to the dispute. See *Regions Bank v. Weber*, 53 So.2d 1284, 1289 *et seq.* (La. App. 4 Cir. 2010) (applying, after a choice of law analysis, equitable estoppel under Louisiana law) (noting that "Louisiana courts look to federal law in interpreting the Louisiana arbitration statutes," *Id.* 53 So.3d at 1291); *Jones v. Jacobson*, 195 Cal.App. 4th 1, 20 (Cal.App. 4 Dist. 2011) (discussing equitable estoppel under California law).

society under direct benefit estoppel.

The Court based its decision on the "direct benefit" ground of "direct benefit" estoppel, holding that the purchaser had sought and received "direct benefits" from the underlying contract, and that its claim were "premised upon" that contract. *Id.* 464 F.3d at 518. It based this holding on several findings. First, it found that the classification documents were necessary to the sale, as the ship had to be in class and its expiring inspection had to be updated before the sale could go through. *Hellenic*, 464 F.3d at 519. As the purchaser admitted to the court, "[w]e needed that last certification . . . before we could have gone through with the deal." *Id.* It was thus a straightforward conclusion that the purchaser had directly sought and obtained a benefit from the contract.

Second, the misrepresentations that formed the basis of the purchaser's complaint were all contained in certifications issued under the contract containing the arbitration clause. The nonsignatory's claim was thus plainly "premised upon" the work performed under that agreement.

Third, the purchaser specifically alleged in its complaint that the classification society "'knew, or should have known,' that its representations were intended for [the purchaser's] *guidance and benefit* in a business transaction." *Id.* at 519 (emphasis in original). The purchaser alleged this because "[t]he very nature of the claim brought requires that [the classification society's] performance under the contract be for [the purchaser's] benefit." *Id.* As the panel explained, "[a]n element of" the purchaser's maritime "cause of action" was "the requirement that the classification society must have . . . 'supplied false information for [the vessel purchaser's] *guidance* in a business transaction.'" *Id.* (emphasis in original). A plaintiff in such a case must be an entity "for which *benefit and guidance* the defendant either intends to supply the information or knows that the recipient intends to supply it." *Id.* (emphasis in original) (internal quotations omitted).

On these bases, it was not difficult for the court to conclude that the party seeking to avoid arbitration had received a "direct benefit" from the contract containing the arbitration clause, and that its claim was "premised upon" that contract, or the work performed under it. We note that there, unlike here, there was no distinction between – or corporate veil separating – the nonsignatory seeking to avoid arbitration and the (likewise nonsignatory) party for whose benefit the contract was concluded. Finally, it was undisputed that the work which gave rise to the nonsignatory's claim was the work performed under that contract, and that the nonsignatory's claim was "premised upon" the work and contract from which it received benefits.

The Johanson Defendants read this case differently. They ignore these elements and instead read it, ultimately, as compelling arbitration any time a plaintiff sues a defendant who signed a contract containing an arbitration clause from which the plaintiff received "a direct and substantial benefit." (Doc. 99, p. 4).

We disagree. We find that such a reading ignores the second finding of the *Hellenic* court, that the nonsignatory plaintiff's claim was "premised upon" the contract containing the arbitration clause, or at least the work performed under that contract. *Hellenic*, 464 F.3d at 518. This omission leads to absurd results. Illustratively, even if Plaintiffs hired the Law Firm twenty years from now to cater an anniversary party, under this reading – because they previously and allegedly had directly benefitted from a contract containing an arbitration clause to which the Law Firm was a signatory – they would be bound to arbitrate any dispute that arose over their cooking. In short, merely that a party received a "direct and substantial benefit" from a contract is not enough; the party's claim in the present litigation must also be *premised upon* that contract, or at least the work performed under it.

This point is seen in the earlier definition of equitable estoppel, of which the discussion in *Hellenic* was an elucidation. As the panel in *Hellenic* states, the principle driving the doctrine is that a party should not be permitted to "embrace" a contract "during the life" of that contract, "but then, during litigation, attempt to repudiate the arbitration clause in the contract." *Id*. 464 F.3d at 518. The Johanson Defendants' reading focuses on the first prong of this rule, whether the party embraced the contract by receiving a direct benefit from it.[8] However, it ignores the second, that the party must deny *the same contract* in litigation. Where, as here, the claim is not premised upon that contract, or at least the work performed under it, the doctrine does not apply.

One can also frame this rule in the converse, as was the focus of the panel in *Hellenic*, as stating that the transaction giving rise to the present dispute – the suit before the court in which the nonsignatory is seeking to avoid arbitration – must be the same transaction as that facilitated by the arbitration agreement, and from which the nonsignatory sought and received a "direct benefit."

We also disagree with the Johanson Defendants' reading because it would bring *Hellenic* into direct conflict with prior Fifth Circuit precedent in this area, including *Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 345 F.3d 347, 361-62 (5th Cir. 2003). Meanwhile, the panel in *Hellenic* cited *Bridas* on seven different occasions, including six times in the section discussing equitable estoppel alone, *Hellenic*, 464 F.3d at 517-18, and it otherwise gave no indication that it sought to disturb or overrule this decision.

More specifically, *Bridas* stands for the rule that "direct benefits estoppel" will usually be

---

[8] On this point, see also *Noble Drilling Services, Inc. v. Certez USA, Inc.*, which described two ways "[a] non-signatory can 'embrace' a contract containing an arbitration clause, . . . (1) by knowingly seeking and obtaining "direct benefits" from that contract; or (2) by seeking to enforce the terms of that contract or asserting claims that must be determined by reference to that contract. 620 F.3d 469, 473 (5th Cir. 2010) (internal citations omitted).

appropriate only where "the nonsignatory had brought suit against a signatory premised in part upon the agreement." *Bridas*, 345 F.3d at 362 (internal citations omitted). This rule was affirmed in the second prong of *Hellenic*, discussed above, where the panel specifically found, citing *Bridas*, that the nonsignatory's claim was "premised upon" the contract containing the arbitration clause in several ways. 464 F.3d at 518.

In *Bridas*, a party to an energy exploration agreement with a corporation established by the government of Turkmenistan for the purpose of exploiting the country's natural resources sued both the corporation and the Turkmen government. The agreement had an arbitration clause, and the plaintiff sought to compel both the corporation and the government to arbitrate.

The government was the founder and owner of the corporation, so it obviously had knowledge of the agreement and had substantially and directly benefitted from it in multiple ways; likewise, the claims against it were "inextricably intertwined" with those against the corporation. *Bridas*, 345 F.3d at 361-62. Nonetheless, the panel found that estoppel – direct benefits or otherwise – should not and did not apply because the nonsignatory had not signed the agreement, and it had not brought "suit against a signatory premised in part upon the agreement." *Bridas*, 345 F.3d at 362 (citing *E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.*, 269 F.3d 187, 199 [3rd Cir. 2001]; *Deloitte Noraudit A/S v. Deloitte Haskins & Sells, U.S.*, 9 F.3d 1060, 1064 [2nd Cir. 1993]; *Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH*, 206 F.3d 411, 418 [4th Cir. 2000]; *American Bureau of Shipping v. Tencara Shipyard S.P.A.*, 170 F.3d 349, 353 [2nd Cir. 1999]).

As it discussed, estoppel is most appropriate where "the parties resisting arbitration had expressly agreed to arbitrate claims of the very type that they asserted against the nonsignatory, as

'[i]t is more foreseeable . . . that a party who has actually agreed in writing to arbitrate claims with someone might be compelled to broaden the scope of his agreement to include others." *Id*. 345 F.3d at 361 (quoting J. Douglas Uloth & J. Hamilton Rial, III, *Equitable Estoppel as a Basis for Compelling Nonsignatories to Arbitrate-A Bridge Too Far?*, 21 Rev. Litig. 593, 633 [2002]). Expanding the doctrine of equitable estoppel as suggested by the signatory there, it found, "would threaten to overwhelm the fundamental premise that a party cannot be compelled to arbitrate a matter without its agreement." *Id*.

Otherwise, it found, direct benefits estoppel is only appropriate where the nonsignatory embraces the agreement and makes a claim against the signatory "premised in part upon the agreement." *Id*. 345 F.3d at 362.  Where the claim and benefit are distinct – where the nonsignatory claims based upon a different agreement, and for (mal)performance *not* rendered under the agreement containing the arbitration clause – this doctrine does not apply.

Finally, even when it does apply, the panel found, "[t]he use of equitable estoppel is" not automatic but "within a district court's discretion." *Bridas*, 345 F.3d at 360.

The final case discussed by the Johanson Defendants is the district court decision in *Blaustein v. Huete*. 2009 WL 2982928 (E.D. La. 2009).  There, the court held that an attorney-client contract which included an arbitration agreement did not apply to the individual claims of a plaintiff who had signed the agreement in his corporate capacity and now sued the attorney, as an individual, for malpractice and fraud. (Doc. 95-1, p. 10).  The district court found that the plaintiff's argument that the agreement should not bind him individually because he had signed it in his corporate capacity "would render 'all arbitration agreements virtually unenforceable since parties would be able to sue in an alternative capacity and claim to be outside of the arbitration agreement.'" (Doc. 95-1, p. 10)

-13-

(quoting *Blaustein*, 2009 WL 2982928 at *3).

We agree with the Johanson Defendants that this case is analogous to our own. We disagree with the district court's conclusion on the merits. However, the district court's decision has been overruled. *Blaustein*, 2010 WL 7097472 (5th Cir. 2010).

The Fifth Circuit's superceding decision was limited in the issues it addressed, so it does not entirely dispense of the case before us. Nonetheless, given its similarities to our own case, its discussion is enlightening for us in several ways.

First, the Fifth Circuit noted, as we independently discussed above, that "[a]lthough there is a presumption favoring liberal construction of arbitration clauses, that presumption is not applicable to the threshold determination [of] whether a party has agreed to arbitrate." *Blaustein*, 2010 WL 7097472 at *1.

Second the language of the contract at issue there was similar to that of the Fee Agreements here, particularly in how it describes the parties. That contract stated that "[t]he Client and [the law firm] jointly agree that any dispute . . . between us arising out of or relating in any way to this engagement shall be resolved through binding arbitration. . ." *Id*. 2010 WL 7097472 at *2. Interpreting this language, the panel found:

> Although the substantive scope of that clause is broad enough to cover the issues [the nonsignatory] raises, the clause, by its very terms, only binds "[t]he Client and [the law firm]" on claims "between us." It is readily apparent from the contract that "the Client" is [the corporation], which is listed as the sole client at the beginning of the contract and again at the end, with the signatures of two of its officers serving as the signatures of [the corporation]. [The nonsignatory] signed the agreement, but only as a representative of [the corporation].

*Id*. As discussed below, that analysis is pertinent here, where the contracts contain similarly clear language delineating that they are between the Law Firm and the Companies, not the Plaintiffs as

-14-

individuals.

Finally, the panel in *Blaustein* noted that "[w]hether [the nonsignatory] was in fact a client of [the law firm], and thus whether he actually has any individual claims against [the law firm] separate from those assertable on behalf of [the corporation], has not yet been established." *Id*. In addition, regarding the district court's concern that permitting suits by individual corporate officers "would render all arbitration agreements virtually unenforceable," the panel found that "we are content with the fact that, to the extent that a firm contemplates representing a corporate entity *and* its individual officers, and wishes to bind *all* of those clients to an arbitration clause, it can require that each sign an agreement stating such." 2010 WL 7097472, n. 5. These statements imply that, if the plaintiff had such a separate and individual client relationship with the firm and the claims against the firm were based on work performed under that separate representation, then the arbitration agreement between the law firm and the corporation would not bind the plaintiff as a nonsignatory, despite his knowledge of and benefit from it. The panel thus endorsed a principle derived from *Hellenic* above, that one's status as a corporate representative, and the benefits one receives because of that status from a contract one signs in one's corporate capacity, is, without more, an insufficient "embrace" of that contract to bind an individual to arbitrate under that contract.

## III. Application

The conditions discussed above, where applying equitable estoppel is appropriate, plainly do not prevail here. Factually, and consistent with the Fee Agreements containing the arbitration clauses, we find that the work performed by the Law Firm under those Agreements was for and on behalf of the Companies, and the benefits the Bilyeus received from them were not "direct" but only in their corporate capacity as owners and officers of the Companies. We find further that the Law

Firm began at some point – though the exact date and circumstances remain in dispute – to perform work for the Bilyeus as individuals without a written contract. This client relationship was distinct from that which the Law Firm maintained with the Companies, and it entailed the performance of work that was distinct from that which it performed under the Fee Agreements. Finally, we find that it is this separate and distinct work which gives rise to the Bilyeus' complaint and upon which their claim is premised, and that their claim can be decided entirely without reference to or implication of the Agreements and the work performed under them.

As in *Blaustein*, the distinction between the Bilyeus as individuals – including the work performed for them in that capacity – and the clients of the Fee Agreements is clear if one examines the language of those Agreements. So, in the "Services to be Performed," the Law Firm agreed to:

> provide the following legal services **to and on behalf of [the Companies]** ("the Services"): Consult with and provide advice regarding the analysis, feasibility, design, and, potentially, implementation of (a) [the Companies] Employee Stock Ownership Plan and Trust and (b) a liquidity plan for [the Companies] and [their] shareholders and related transactions. The [Law Firm] also will provide such other and further services **to [the Companies] as may later be agreed upon between the [Law Firm] and [the Companies] which Services will be subject to this Agreement.**

(Doc. 95-3, pp. 5, 10, ¶ 1) (emphasis added).

Two points from that passage are pertinent here. First, it establishes that the contracts are between the Law Firm and the Companies, Comm-Craft and DirecTech. In *Hellenic*, the contract was allegedly struck directly "for the benefit and guidance" of the nonsignatory, as a necessary and integral part of the deal which gave rise to the nonsignatory's complaint. Here, as in *Blaustein*, there is no indication that there could be another party to the Agreements, nor that they have been struck for another party's (direct) benefit.

-16-

Second, and more importantly, the Agreements specifically discuss the topic of future additional agreements for legal services. However, they state that these services will be provided "to [the Companies] as may later be agreed upon between the [Law Firm] and [the Companies]." They do not contemplate any future agreements between the Law Firm and third parties, including the companies' (former) shareholders or officers as individuals, nor do they indicate that they would apply to any agreement or relationship the Law Firm may have with these individuals in the future.

These facts are here almost indisputable, and after a cursory effort the Johanson Defendants do not seriously contest them. Rather, they lodge several other arguments for why, they claim, the Bilyeus' claim is nonetheless "premised upon" the Agreements. We find that these arguments either misstate the facts of the case, of they fail to correspond to situations where estoppel is permitted, much less compelled.

For one, they claim that the services about which the Bilyeus complain were provided for in the Agreements, specifically that they were part of the "advice 'regarding a liquidity plan for [the Companies] and [their] shareholders and related transactions.'" (Doc. 95-1, p. 9) (quoting the contract). We reject this contention. The contracts were to establish employee stock option plans and trusts for the Companies, and to allow the shareholders to receive liquidity for their shares. The Law Firm performed that work for all of the Companies in the spring and summer of 2004. Mr. Bilyeu sold his shares to the ESOPs at this time, receiving significant up-front cash payments of several million dollars and promissory notes with scheduled monthly payments. Mr. Bilyeu received his up-front payments and notes; by the end of that summer he no longer worked or was an officer in either company, and he had sold many of his shares of both and had completely divested himself of his holdings of one company. There is no suggestion that any of the work involved in completing

-17-

those transactions was performed fraudulently or unprofessionally.

Instead, the fraud of which Plaintiffs complain – and the performance upon which their claim is premised – allegedly occurred in the representation the Law Firm, and Mr. Johanson in particular, provided to the Bilyeus regarding how they could avoid tax payments on these proceeds.  In particular, Mr. Johanson allegedly advised them to reinvest these proceeds in "qualified replacement property" – additional securities – and then to loan those securities to an off-shore corporation in exchange for cash.  Various of the Johanson Defendants implemented these transactions, including by bringing in a team of investment advisors and financial intermediaries to assist with them.  (Doc. 1-2, p. 7 *et seq.*, Plaintiff's original petition).

In our view, the representation regarding the "liquidity plan" for the Companies and their shareholders only extended to the transactions to permit those shareholders to sell and realize proceeds for their shares.  In this, we note that the Agreements were only for services "to and on behalf of the Companies," (Doc. 95-3, pp. 5 and 10, ¶ 1), not the shareholders themselves.  Once the work was for the shareholders to advance their own interests separate and apart from the interests they once had in the Companies,[9] the services were no longer being provided to Plaintiffs as shareholders in the Companies but as individuals, and the Law Firm was no longer serving the Companies, but the former officers and owners as individuals.  We find that if the Law Firm, once it embarked on such representation, wished to bind Plaintiffs to arbitrate disputes arising from the work it was performing for them as individuals, it should have required them to sign their own

---

[9] To be clear, as noted, the parties dispute when this representation actually began.  Our finding here does not depend on this timing, but on the sequence of events and how we characterize the entity for whom each event was performed.  Even if the Johanson Defendants had discussed the strategy with the Bilyeus from the beginning, they could only execute the strategy once the work establishing and monetizing the ESOPs was complete, and they performed these tasks in service of the interests of the Bilyeus as individuals, not the Companies.

"agreement stating such." *Blaustein*, 2010 WL 7097472 at *2, n. 5.

In all, it stretches the meaning of the Agreements beyond their plausible limits to find that the Law Firm was still serving the Companies when it was providing this personal and unrelated advice to Plaintiffs. The Johanson Defendants recognize as such, and thus they suggest, second, that the Bilyeus should be bound to arbitrate under the Agreements because the Agreements, as quoted above, provided for "other and further Services to [the Companies] as may later be agreed upon by [the Companies] and the [Law Firm] which Services will be subject to this Agreement." (Doc. 95-3 pp. 5, 10). The Johanson Defendants claim that this "language makes it clear that Mr. Johanson and the Bilyeus had a mutual understanding that Mr. Johanson and Johanson Berenson LLP were to provide the Bilyeus individual professional services pursuant to the [Agreements]. . ." (Doc. 95-1, p. 9).

If such a "mutual understanding" existed between the Law Firm and the Bilyeus as individuals, it is not evident in this language. The clauses the Johanson Defendants quote do not even suggest they were intended to bind or extend to third parties. To the contrary, though the possibility that future work could be performed for the Bilyeus as individuals was, if not foreseeable, at least on the horizon at the time the Agreements with the Companies were executed, the Agreements scrupulously and explicitly limit that any future representation will be "agreed upon by [the Companies] and the [Law Firm]," not by the Law Firm and the Bilyeus as individuals. (Doc. 95-3, pp. 5, 10). The Johanson Defendants' claim that these Agreements contemplated and provided for the work that was later performed for the Bilyeus as individuals – much less that they evidence a "mutual understanding" on this point between Mr. Bilyeu as an individual and the Law Firm sufficient to bind the Bilyeus to the terms of these agreements – thus contradicts the express

language of the Agreements.

Finally, the Johanson Defendants stress that the Bilyeus knew of the contracts and received various benefits from them. (Doc. 95-1, p. 9). This is true. Woody Bilyeu was a shareholder and officer of both of the Companies, so he and his wife knew of and benefitted from the work the Johanson Defendants performed for the Companies. However, as discussed above, the simple receipt of an attenuated benefit does not bind a party to arbitrate under "direct benefits" estoppel. Instead, to repeat, this doctrine only applies where the plaintiff's claim is "premised upon" the agreement from which the party received the benefit, or at least work performed under that agreement. Plaintiffs' claim here is not. The Bilyeus do not sue under the Agreements, or for the work performed by the Law Firm under them, but for the work the Law Firm performed for them as individuals. The only connection between the two is that, according to the Law Firm's allegedly fraudulent legal advice, Plaintiffs were only eligible for the "Loan Strategy" because the Law Firm had helped them to realize the proceeds from the ESOPs on which they now owed a tax burden. This work, however, could have been performed by a separate firm, and Plaintiffs' claims would not change at all. There is no necessary relationship between that work and Plaintiffs' claims. The work performed under the Agreements and the work upon which Plaintiffs' present claims are premised exist independently, one performed without complaint for the Companies and their shareholders, and the other conduct (allegedly fraudulently) in advance of Plaintiffs' separate and individual interests. Unless one disregards the corporate veil separating Plaintiffs from the Companies and their individual from their corporate roles and interests, then there is no basis for finding that Plaintiffs' claims are "premised upon" the Agreements, or the work the Law Firm performed under them.

In this regard, we note that while equitable estoppel is a separate theory for binding

-20-

nonsignatories under both Louisiana and California law, what the Johanson Defendants are trying to do–to bind a corporate shareholder and officer personally to a contract he signed in his corporate capacity–has a more commonly recognized name, veil-piercing or alter ego.  That this doctrine actually underlies the Johanson Defendants' theory is hinted at several times in their motion, where they make observations implying that, simply because Mr. Bilyeu knew of the arbitration clause or benefitted from the companies' contract due to his corporate position, he should be bound by it.  As a corporate shareholder and officer will always benefit, often even "directly," from corporate contracts, applying "direct benefits" estoppel so broadly would swallow – and federalize – this area of state corporate law.  We are unaware of any court which has applied equitable estoppel in this way – certainly it does not match the factual circumstances in any of the cases cited by the Johanson Defendants – nor do we discern anything in prior Supreme Court or Fifth Circuit precedent indicating that they intend such a result.

This reality is likewise hinted at by a trenchant statement of the Bilyeus in their supporting memorandum, that "[i]f the Plaintiffs sought to base their claims on the terms of the Corporation Agreements the Johanson Defendants would, no doubt, assert that the Corporation Agreements only governed services provided to the Corporations and not the Plaintiffs individually." (Doc. 98, p. 13, n. 7).  We cannot speculate about whether the Johanson Defendants would take such a position; however, we have no doubt that they would be legally entitled to do so, because there is absolutely no claim that a piercing of the corporate veil–or any other means by which the Bilyeus could sue the Johanson Defendants under the Agreements–is warranted here.  That the Bilyeus – unlike, for example, the plaintiffs in *Hellenic* – could not maintain a claim under or "premised upon" these Agreements is a sound indication that they likewise should not be bound by them to their detriment,

on equitable estoppel or any other grounds.

Finally, we concur with the Fifth Circuit panel in *Blaustein* that no parade of horribles arises from permitting an individual plaintiff to avoid arbitration for personal claims against a law firm – where those claims are premised upon work performed for him as an individual – even though a company with which he is affiliated has an arbitration agreement with that law firm.  The Fifth Circuit panel found that the firm could protect its interests by having each of its clients sign its own fee agreement.  *Blaustein*, 2010 WL 7097472 at *2, n. 5 ("[W]e are content with the fact that, to the extent that a firm contemplates representing a corporate entity *and* its individual officers, and wishes to bind *all* of those clients to an arbitration clause, it can require that each sign an agreement stating such.").  We agree.

Here specifically, it should have been apparent to the Johanson Defendants that a separate client agreement with the Bilyeus was needed.  The Law Firm continued to serve the Bilyeus once they were no longer officers or employees of either company, and once they were conducting transactions designed solely to benefit them as individuals.  At this point, it should have been obvious that the Law Firm was serving the Bilyeus' individual interests and had formed an attorney-client relationship with them distinct from that it maintained with the Companies.

## IV.  Other Interests

The above forms the core of our analysis and guides our conclusion that this is not a situation where equitable estoppel is permitted.  If we are wrong and it is determined that it is permitted, we find here, in our discretion, that this is nonetheless a situation where it should not be applied.

Two reasons drive this conclusion.  First, as discussed above, though there are situations where equitable estoppel may be used to bind a corporate officer to a corporate contract in his

individual capacity, here, for all intents and purposes, the Johanson Defendants are simply and straightforwardly trying to pierce the corporate veil.  As in *Blaustein*, they are attempting to bind Plaintiffs to certain corporate contracts solely by virtue of their status as corporate shareholders and officers, and the benefits they received from those contracts by virtue of that status.  If equitable estoppel should apply here, we struggle to imagine many veil-piercing situations where it would not; in any case, it would certainly swallow a substantial portion of state corporate law in this area.  We do not believe this result is demanded by applicable precedent, and even if permitted, given our system of federalism and the absence of any indication that the FAA was intended to federalize this body of law, we would not find it advisable.

Second, as discussed above, the Johanson Defendants were self-evidently advising Plaintiffs as individuals and assisting them in advancing their personal interests; yet, these Defendants, as practicing attorneys, chose not to strike individual fee agreements with them.  For this reason, even if the benefit Plaintiffs received from the Agreements, and the relationship between their claim and those Agreements and / or that benefit, is such as to permit estoppel in these situations, we would decline to apply it.  Equitable estoppel is supposed to be equitable, to protect parties who, given the realities of their situation, either could not or reasonably should not have been expected to protect themselves.  There are no such inequities in the Johanson Defendants' favor, no injustice that here needs to be corrected.  To the contrary, by the ethical standards that govern attorney behavior and attorney-client relationships, Mr. Johanson and his firm(s) should have known to protect themselves, and they had the means at their disposal to do so.  We can imagine reasons why they did not do so, some nefarious and some innocent.  For whatever reason, they chose not to act with the diligence that is to be expected of attorneys in their situation; we do not believe it is our place to assist them,

-23-

against their former client, in avoiding the consequences of that decision.

CONCLUSION

In all, and for the reasons given above, we find that these parties never concluded an arbitration agreement, and that, under applicable precedent, application of the doctrine of equitable estoppel would here be impermissible, and if permitted, it would nonetheless be inappropriate.  As we rule on this basis, the other arguments of the parties concerning why the case should or should not be arbitrated, are rendered moot.[10]  Accordingly:

IT IS ORDERED that the Johanson Defendants' motion to stay pending arbitration (Doc. 95) is DENIED.

SIGNED on this 17 day of August, 2011, at Alexandria, Louisiana.

DEE D. DRELL
UNITED STATES DISTRICT JUDGE

---

[10]  We thus do not decide whether the arbitration clause is unconscionable under Louisiana law, what state's contract law, if any, applies to this dispute, nor whether the contract could have bound the nonsignatory Mrs. Bilyeu to arbitrate against the nonsignatory members of the Johanson Defendants.